■ In the Matter of BOARD OF EDUCATION OF YONKERS CITY SCHOOL DISTRICT, Respondent, v YONKERS FEDERATION OF TEACHERS, Appellant.—In a proceeding pursuant to CPLR article 75 to stay arbitration of the respondent's grievance, the appeal is from a judgment of the Supreme Court, Westchester County (Dachenhausen, J.), entered May 22, 1987, which granted the petition.

Ordered that the judgment is affirmed, with costs.

On November 20, 1985, the United States District Court for the Southern District of New York (Sand, J.) found that the petitioner, the Board of Education of the Yonkers City School District (hereinafter the school board), had intentionally segregated the Yonkers public schools *(United States v Yonkers Bd. of Educ.,* 624 F Supp 1276, *affd* 837 F2d 1181, *cert denied —* US —, 108 S Ct 2821). Subsequently, the appellant, the Yonkers Federation of Teachers (hereinafter the YFT) was granted permission to intervene in the suit on the question of fashioning of a remedy. The YFT's participation was limited solely to "those aspects of the plan * * * that relate to the teachers assignment provisions relating to transfer or seniority and the interrelationship between any such provisions in the plan and Article 15 of the collective bargaining agreement" between the school board and the YFT.

On May 13, 1986, Judge Sand issued a sweeping remedial order for the desegregation of the Yonkers public schools *(United States v Yonkers Bd. of Educ.,* 635 F Supp 1538, *affd* 837 F2d 1181, *cert denied —* US —, 108 S Ct 2821, *supra).* The order pertaining to the instant controversy read in pertinent part:

"The district shall make every effort to ensure * * * the racial composition of teachers at each school * * * as a result of reassignments in connection with school closings and conversions and the reassignment of teachers to magnet schools and magnet programs. Thereafter, the district shall attempt to maintain the racial distribution of teachers on a reasonably uniform basis, while respecting the provisions of the collective bargaining agreement between the district and the Yonkers Federation of Teachers.

"If the Board cannot achieve this goal while adhering to the collective bargaining agreement, the parties may make applications to the Court for the requisite modifications.

"With respect to the staffing of magnet programs and magnet schools, the district and the Yonkers Federation of Teachers have agreed to establish a process for selection which would address the mutual concerns of both parties" *(United States v Yonkers Bd. of Educ.,* 635 F Supp 1538, 1547, *supra).* The order required the implementation of a "human relations program" designed to ease the tension that would be created by the desegregation plan. It also provided for retention by the Federal court of continuing jurisdiction over the desegregation plan.

In August of 1986, the school board sent all teachers represented by the YFT a posting advising that eight positions as human relations facilitators and two positions in "magnet" programs, "Computer/Business/Accounting" and "preprofessional science", were available and that applications were being sought. The instant dispute is premised on the YFT's contention that these 10 positions were staffed in violation of certain provisions of the collective bargaining agreement negotiated between the parties. On November 3, 1986, the YFT filed a notice of intention to arbitrate on behalf of applicants who had more seniority than those who were awarded the positions. In response, the school board petitioned the Supreme Court pursuant to CPLR 7503 (b) for a stay of the arbitration. The Supreme Court granted the petition, holding that the YFT had waived its right to arbitrate when it elected to litigate by intervening in the Federal suit. The Supreme Court also held that arbitration of the grievance would violate public policy by encroaching on the Federal District Court's continuing jurisdiction over the Yonkers school desegregation. Although we do not agree that the YFT waived its right to arbitrate, the Supreme Court nonetheless properly stayed arbitration.

With respect to the waiver issue, we conclude that the YFT's resort to the judicial forum once the Federal District Court returned its decision regarding the mandatory desegregation of schools and the YFT's subsequent limited participation in that litigation did not effect a waiver of the contractual right to arbitrate. The present dispute had not yet arisen and in any event it is apparent that the application for leave to intervene stemmed from the urgent need for immediate action to preserve contractual rights *(cf., Sherrill v Grayco Bldrs.,* 64 NY2d 261; *see also, Preiss/Breismeister Architects v Westin Hotel Co.,* 56 NY2d 787). Waiver, therefore, did not occur. We find however that arbitration was properly stayed as the instant dispute does not fall within the definition of an arbi-

trable grievance as set forth in the collective bargaining agreement.

Article XIII (A) (2) of the collective bargaining agreement defines "grievance" as any "claimed violation, misinterpretation, or inequitable application of the existing [collective bargaining] Agreement * * * provided, however, that such terms shall not include * * * any other matters which are otherwise reviewable pursuant to law". The issue is thus whether the Federal court intended to retain jurisdiction over this dispute, i.e., whether the dispute is "otherwise reviewable pursuant to law". We conclude that it is.

The Federal remedy order evidences an intent to first defer routine transfers and seniority grievances to the arbitration process. However, the present controversy emanates from implementation of a human relations program and the staffing of facilitator positions and magnet programs, all of which were effectuated in direct response to the Federal court's remedial order. It is this implementation of the desegregation plan which underlies the present dispute and inasmuch as the Federal court retained continuing jurisdiction over the fundamental issue, the dispute is an "other matter" reviewable in the Federal judicial forum and as such is not an arbitrable grievance.

Finally, we note that while the possibility an arbiter "might make an award that could be said to be in violation of public policy [may] not justify judicial intervention in the arbitration process" *(Matter of Board of Educ. [Connetquot Teachers Assn.],* 60 NY2d 840, 842; CPLR 7501), where the public policy is "substantial", the issue will be barred from arbitration *(Matter of Port Washington Union Free School Dist. v Port Washington Teachers Assn.,* 45 NY2d 411). We find encroachment into the continuing jurisdiction of a Federal District Court to be such a substantial public policy interest. We also note it is "not generally permissible when issues of strong public policy are involved to allow the demand to proceed to arbitration subject to subsequent review by the courts * * * to vacate the award" *(Matter of Port Washington Union Free School Dist. v Port Washington Teachers Assn., supra,* at 423-424 [Breitel, Ch. J., concurring]). Bracken, J. P., Lawrence, Spatt and Harwood, JJ., concur.